# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BHC DEVELOPMENT, L.C., et al.,      )
       )
               **Plaintiffs,** )
       )     **CIVIL ACTION**
**v.**        )
       )     **No. 12-2393-KHV**
**BALLY GAMING, INC.,**        )
       )
               **Defendant.** )
_____ )

## MEMORANDUM AND ORDER

BHC Development, L.C. and BHCMC, L.L.C. bring suit against Bally Gaming, Inc. for breach of contract (Count I), negligent misrepresentation (Count II), fraudulent inducement (Count III), breach of express warranty (Count IV) and breach of warranty of merchantability (Count V). All claims arise from plaintiffs' purchase of casino management hardware and software from defendant. Defendant counterclaims that plaintiffs failed to make payments due under the purchase agreement and continued to use the software after their license expired. This matter is before the Court on Defendant's Motion For Summary Judgment (Doc. #83) filed July 15, 2013. Defendant seeks summary judgment on each of plaintiffs' claims and on its counterclaim. For the following reasons the Court overrules defendant's motion in part.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A "genuine" factual dispute is one "on which the jury could reasonably

find for the plaintiff," and requires more than a mere scintilla of evidence. Liberty Lobby, 477 U.S. at 252. A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Id. at 248.

The moving party bears the initial burden of showing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1085 (10th Cir. 2008). Once the moving party meets its burden, the burden shifts to the nonmoving parties to show that a genuine issue remains for trial with respect to the dispositive matters for which they carry the burden of proof. Nat'l Am. Ins. Co. v. Am. Re-Ins. Co., 358 F.3d 736, 739 (10th Cir. 2004); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). As to these matters, the nonmoving parties may not rest on the pleadings but must set forth specific facts. Fed. R. Civ. P. 56(e)(2); Matsushita, 475 U.S. at 586-87; Justice, 527 F.3d at 1085. Conclusory allegations not supported by evidence are insufficient to establish a genuine issue of material fact. Jarvis v. Potter, 500 F.3d 1113, 1120 (10th Cir. 2007); see Kidd v. Taos Ski Valley, Inc., 88 F.3d 848, 853 (10th Cir. 1996).

When applying this standard, the Court must view the factual record in the light most favorable to the parties opposing the motion for summary judgment. Duvall v. Ga.-Pac. Consumer Prods., L.P., 607 F.3d 1255, 1260 (10th Cir. 2010); see Ricci v. DeStefano, 557 U.S. 557, 586 (2009). Summary judgment may be granted if the nonmoving parties' evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

**Facts**

The following facts are uncontroverted or where controverted, set forth in a light most favorable to plaintiffs.

Plaintiff BHC Development, L.C. ("BHC") is a Kansas limited liability company. Plaintiff BHCMC, L.L.C. ("BHCMC") is related to BHC. In December of 2008, plaintiffs obtained a contract to manage the state-owned Boot Hill Casino in Dodge City, Kansas. Plaintiffs hired the Navegante Group to assist in that effort. Navegante in turn hired G.H.I. Solutions to assist in software selection and acquisition. G.H.I. sent vendors a request for proposal to fulfill the slot accounting and casino management software needs of the casino. The request included a spreadsheet for vendors to indicate whether their software could satisfy each of 644 distinct functionality requirements.[1] Doc. #104-9.

Bally Gaming, Inc., is a Nevada corporation which provides computer software and hardware for casino gaming and operations.[2] On April 1, 2009, Bally responded to the G.H.I. request for proposal.[3] Jeffrey Connors, Bally Vice President of Regional Sales, completed the spreadsheet for

---

[1]  The spreadsheet directed vendors to describe the ability of their software to fulfill each requirement as "Standard," "Enhancement," "Third Party," or "No." Doc. #104-13 at 2. A response of "Standard" meant that "[n]either special configuration nor programming is required to complete the requirement" and that "User may execute the requirement by a few keystrokes." Id. The "Enhancement" response meant that "[v]endor would need to write a change to the software to accommodate the requirement." Id. The "Third Party" response meant that "[t]here is a software package offered by another company that fulfills the need" and that the "vendor will complete the interface." Id. The "No" response meant that "[n]either vendor nor known third party can execute the requirement." As to the spreadsheet, Bally responded "Standard" to 598 of the 644 requirements, and "No" to one requirement. Id. at 3-33.

[2]  Bally has a significant share of the North American market for casino management software.

[3]  The request for proposal stated that any responding vendor "must be willing to
(continued...)

Bally with assistance from other Bally employees. In a proposal analysis which it presented to plaintiffs' management team, G.H.I. summarized all vendor responses to the spreadsheet.[4] To determine which software to purchase, Doug Smith, Casino Project Director, paid specific attention to the spreadsheet and to G.H.I.'s summary of the spreadsheet.[5]

On October 6, 2009, plaintiffs and defendant executed a Purchase and License Agreement. See Agreement (Doc. #84-1). In negotiating the agreement, all parties were represented by counsel. BHCMC executed the Agreement "solely as related to the payment obligations described in Section 21(c)" of the Agreement. See id. at 26. In entering the Agreement, plaintiffs relied on Bally's representations in the spreadsheet and on other representations by Bally.

The Agreement provides that plaintiffs pay Bally $1,582,475.00 for hardware, software licenses and professional services, plus monthly maintenance fees of $12,246.88. See Ex. A to Agreement. The Agreement grants BHC "the non-exclusive right and perpetual license . . . to use each program in the Software solely as described in this Agreement." See Agreement at ¶ 1. The Agreement provides that BHC is in default if "[BHC] breaches any condition . . . or fails for any reason to make payment . . . when due." See Agreement at ¶ 12(b). The Agreement provides that Bally is in default if, among other things, it breaches any condition of the Agreement and fails to cure such breach after written notice, or if "[a]ny representation or warranty made by Bally herein or in any other document or certificate furnished by Bally to [BHC] is incorrect in any material

_____

[3](...continued)
contractually commit to all statements made in the response to this RFP and during oral presentations to this RFP." Doc. #104-9 at 4.

[4]      In the spreadsheet, G.H.I. accurately represented Bally's response.

[5]      Smith had no experience in dealing with the functionality of casino management software.

respect and Bally knew of such error when made." See Agreement at ¶ 15.[6]

The Agreement provides a 90-day limited warranty on hardware. See id. at ¶ 18.[7] Paragraph 19 of the Agreement, titled "**WARRANTY DISCLAIMER AND LIMITATION OF LIABILITY**," states that "[e]xcept as otherwise expressly stated herein, Bally disclaims any and all express or implied warranty, condition, or guaranty, including any implied warranty of

---

[6] Paragraph 15 of the Agreement provides in full as follows:

**15. DEFAULT BY BALLY:**

An event of "Default by Bally" shall occur if:

(a) Bally breaches any condition of this Agreement and Bally fails to cure or remedy such default or breach after receipt of express written notice thereof from [BHC]:
(b) Bally is or becomes insolvent or Bally institutes any voluntary proceedings under any insolvency or bankruptcy law; Bally is adjudicated as bankrupt or insolvent; there is the appointment of a receiver of Bally's property; or there is an assignment by Bally for the benefit of creditors; or
(c) Any representation or warranty made by Bally herein or in any other document or certificate furnished by Bally to USER is incorrect in any material respect and Bally knew of such error when made.

Agreement at ¶ 15.

[7] The warranty section provided in relevant part as follows:

**18. WARRANTIES:**

For a period of ninety (90) days after the date of installation, which date of installation shall be no more than sixty (60) days after the USER'S receipt of Bally Hardware, Bally warrants to USER that the Bally Hardware, if properly installed by USER pursuant to Bally's specifications, will be free from defects in workmanship under normal use and service. The 90-day warranty period shall not be extended by the time of repair or for any other reason. Bally's obligations under this limited warranty for Bally Hardware shall be limited to the repair or replacement, in Bally's sole discretion of the defective Bally Hardware.

Agreement at ¶ 18.

-5-

merchantability or fitness for a particular purpose and other obligations on the part of Bally for or

with respect to the Software." Id. at ¶ 19.[8]  It also provides that the parties waive all special,

---

[8]     Section 19 of the Agreement provides in full as follows:

**19.     WARRANTY DISCLAIMER AND LIMITATION OF LIABILITY**:

Except as otherwise expressly stated herein, Bally disclaims any and all express or implied warranty, condition, or guaranty, including any implied warranty of merchantability or fitness for a particular purpose and other obligations on the part of Bally for or with respect to the Software, Bally Hardware and Computer Room Equipment or any Professional Services provided by Bally associated with this Agreement. Further, Bally shall have no liability for any errors, defects or other problems caused in use of the Software, Bally Hardware and Computer Room Equipment resulting directly or indirectly from any modifications, alterations, additions or other changes made by USER to the Software, Bally Hardware and Computer Room Equipment without prior authorization from Bally.

IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, ECONOMIC, EXEMPLARY OR PUNITIVE DAMAGES, INCLUDING BUT NOT LIMITED TO ANY LOST PROFITS OR LOSS OF BUSINESS REVENUES, OR ANY AND ALL OTHER LOSSES OR DAMAGES TO THE OTHER PARTY OR ANY THIRD PARTIES INCLUDING BUT NOT LIMITED TO THE OTHER PARTY'S CUSTOMERS AND VENDORS. EACH PARTY UNDERSTANDS, ACKNOWLEDGES AND AGREES TO WAIVE ALL SUCH LIABILITY AND CONSENTS TO WAIVER, EVEN IF THE WAIVING PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

Bally and USER further agree that Bally's cumulative liability to USER for all claims arising out or relating to this Agreement, including Bally's indemnification obligations . . . shall be limited to the total sum of the amounts actually paid by USER for any particular Bally Hardware or Software products pursuant to this Agreement from which such claim(s) may arise, excluding ongoing maintenance payments.  This amount shall not include any sums paid for installation, training and other charges paid under this Agreement not directly related to the purchase price of Software and Bally Hardware.  The provisions of this Agreement allocate the risk between USER and Bally and Bally's pricing reflects this allocation of risk and the limitation of liability specified herein.

Agreement at ¶ 19.

indirect, consequential, economic, exemplary and punitive damages, and limits Bally's cumulative liability for all claims arising out of the Agreement to the amount paid by plaintiffs for the products from which such any claim arises.  Id.

The Agreement includes an integration clause which provides in part that "[t]his Agreement and its Exhibits and Addendum, if any, shall constitute the entire understanding and contract between the parties hereto and supersedes any and all prior contemporaneous oral or written representations or communications with respect to the subject matter hereof, and all of which communications are merged herein." Id. at ¶ 43.[9]

Exhibit A to the Agreement provides that BHC pay Bally $127,380.00 for a slot monitoring system license, $110,330.00 for a casino management system license and $43,425.00 for a promotion license, for a total of $281,135.00 for software.

When the casino opened on December 15, 2009, plaintiffs immediately encountered problems with the software.  Some of the problems continued until June of 2012.  Among others,

---

[9]        Paragraph 43 in its entirety provides as follows:

**43.     ENTIRE AGREEMENT**

This Agreement and its Exhibits and Addendum, if any, shall constitute the entire understanding and contract between the parties hereto and supersedes any and all prior contemporaneous oral or written representations or communications with respect to the subject matter hereof, and all of which communications are merged herein. This agreement shall not be modified, amended or in any way altered except by an instrument in writing signed by both of the parties hereto. All amendments or modifications of this Agreement shall be binding upon the parties despite any lack of consideration so long as the same shall be in writing and executed by the parties hereto. This Agreement has been negotiated by the parties in the English language through their respective legal counsel and therefore, the  parties agree that any ambiguities or discrepancies shall not be interpreted against the drafter.

Agreement at ¶ 43.

the issues were that (1) the software did not generate accurate reports for progressive meters; (2) the software resulted in awards of reward points that players did not earn; (3) upgrades or patches to the software introduced defects not disclosed in release notes; (4) the software produced revenue figures which did not match revenue figures reported by the Kansas Lottery "GTECH" system;[10] (5) when time changed to or from daylight-saving time, the software "lost" transactions; (6) the software could not update the casino player database with information from the national change of address registry; (7) the software could not cause player reward points to expire on certain inactive accounts; (8) the software did not produce monthly reports to compare the actual hold percentage and theoretical hold percentage of every gaming machine, as required by Kansas state regulations; (9) the software frequently produced reports that could not be reconciled with other reports; (10) the software frequently caused the casino to be out of compliance with its own internal controls or with Kansas state regulations; and (11) the software did not generate accurate reports on progressive slot meters.

From 2008 until May of 2012, Joe Sellens was Director of Gaming Enforcement and Audit at the Kansas Lottery. He was responsible to determine whether the casino complied with its internal controls. On several occasions, the Bally software caused the casino to be out of compliance with Kansas state regulations or its own internal controls. When Sellens raised software issues with Bally, Bally sometimes gave him the impression that his expectations were unreasonable.

Ramesh Srinivasan was Senior Vice President of Systems for Bally in 2009 and Chief

---

[10] The Kansas Lottery uses the GTECH system to monitor slot machine activity at all casinos in Kansas. The GTECH system tracks financial accounting figures for all slot machines for the Kansas Lottery to use when collecting revenue from casino managers.

Operating Officer from late 2010 to late 2012. He is now Bally's Chief Executive Officer. In March or April of 2010, Srinivasan told Sellens that the software for the casino had been rushed out to market too soon and contained inherent flaws.

On March 30, 2011, Srinivasan met with plaintiffs' representatives concerning their frustration that the software was not performing as expected. Srinivasan stated that when Bally first proposed the software, he committed that Bally would do whatever it took to make the software successful for the casino. He told plaintiffs that they did not need to pay any of the balance due on the software until they were happy with it.[11] He said that Bally would send a team to them to review all outstanding issues, and assured plaintiffs that Bally would solve them.

After the meeting on March 30, 2011, Srinivasan sent an email to Bally employee Tom Doyle, stating that he was "quite shocked how the Services teams have not done a better job of REALLY working through [the casino's] issues. It is quite amazing how everyone at Bally loves to operate at 30,000 feet and not trouble themselves with working out real solutions for customers." See Doc. #104-20 at 2-3.[12]

On April 18, 2011, Bally personnel went to the casino to observe the software issues that

---

[11]     Srinivasan stated, "It is my job to make you happy. You don't have to pay me until you tell me you're happy." Doc. #104-8 at 40.

[12]     Srinivasan further wrote that he "did not realize till this meeting that CMP was this weak in so many areas," and stated that "[o]ur objectives during our meeting there should be as much to understand how CMP needs to be improved quickly to remove some of the age-old ridiculously stone age constraints (no expiry date functionality yet? cannot run multiple promotions at the same time? Reports never match? - as much as helping them with work-arounds so that they can use the current CMP version better." Doc. #104-20 at 3. Srinivasan also wrote that "[o]ne other thing that came out of the meeting is how much Customer Support gives the run-around to customers with their various guesses one after the other . . . do we really take the solutions we suggest seriously?" Id.

plaintiffs had been reporting.[13]  Doyle later reported to Srinivasan that as a result, Bally employees

identified "critical bugs" that needed corrective action.  Plaintiffs continued to work with Bally to

resolve issues with the software, but became frustrated that their issues were not being successfully

resolved.

On June 10, 2011, Bally Credit and Collections Manager Patrick Spargur wrote Srinivasan.

He asked, "Sharon Stroburg states that you said until they were happy with the system they don't

have to pay for it, is this the case?"  Doc. #104-25 at 2.  Srinivasan responded: "Unfortunately true,

Patrick.  Our Systems teams have done a very poor job with this customer so far.  Fixing their

pending issues has been very slow to move forward with very little sense of urgency.  Our team of

so-called experts went there 2 months ago – and very little seems to have happened to fix their issues

since then.  They have exposed many fundamental weaknesses in CMP that we are making slow

progress with."  Id.

On October 11, 2011, representatives of plaintiffs met with Srinivasan in Las Vegas to

discuss ongoing problems with the software.  Srinivasan told them that "I cannot make you happy.

There's nothing in the world I can do to make you happy."  Doc. #104-8.[14]

After the meeting in Las Vegas, plaintiffs evaluated alternative software options.  In July and

August of 2012, they decided to replace Bally's software.[15]

_____

[13]     Bally personnel had previously expressed disbelief that issues the casino had reported
were actually happening, or told casino personnel that it was their fault.  After the casino employees
demonstrated the problems, Bally employees said "Wow, we didn't know that happened in our
system."  See Doc. #104-8.

[14]     Srinivasan said that based on the casino's extraordinary expectations of perfection
in business software, no system in the world would be able to meet their expectations 100 per cent.

[15]     Plaintiffs replaced the Bally software with software by Konami Gaming, Inc.
(continued...)

Plaintiffs filed this lawsuit, asserting breach of contract, negligent misrepresentation, fraudulent misrepresentation, breach of express warranty and breach of warranty of merchantability. Plaintiffs seek damages of $2,781,007.41, including $1,974,606.65 paid to Bally for software, associated hardware, professional services and monthly maintenance; lost revenues of $656,767.83 caused by software errors and defects; and payments of $149,632.93 to third party consultants to make the software perform as represented by Bally.

Bally counterclaims for breach of contract, asserting that under the Agreement, plaintiffs owe $441,560.90, including $341,500.00 for professional services and $98,946.23 for billable expenses.[16]

## Analysis

Defendant asserts that it is entitled to summary judgment because the language of the Agreement bars each of plaintiffs' claims. In the alternative, defendant asserts that the Agreement limits plaintiffs' damages to what they paid Bally for the software. Finally, defendant asserts that it is entitled to summary judgment on its counterclaim that plaintiffs failed to pay $441,560.90 due under the Agreement.

## I.      Choice of Law

A district court exercising diversity jurisdiction applies the choice of law rules of the state

---

[15](...continued)
Plaintiffs point to evidence that Konami software has allowed plaintiffs to comply with reporting requirements that the Bally software was unable to fulfill. Defendant notes that plaintiffs have refused discovery on the operation of the new software, and assert that they cannot object to discovery and now assert facts concerning areas on which they have not allowed discovery.

[16]      Plaintiffs assert that they owe Bally nothing because (1) Bally induced them to enter the Agreement with fraudulent and negligent misrepresentations, (2) Bally waived its right to receive payment by failing to use reasonable efforts to repair the software and (3) Bally failed to perform under the Agreement. Furthermore, plaintiffs assert that Bally's damage claims do not account for all payments by plaintiffs.

-11-

in which it sits. <u>Mo. Pac. R. Co. v. Kan. Gas & Elec. Co.</u>, 862 F.2d 796, 798 n.1 (10th Cir. 1988). The Agreement contains a provision that Kansas law controls the contract. Kansas choice of law rules allow for the enforcement of such a clause. <u>See</u> <u>Nat'l Equip. Rental, Ltd. v. Taylor</u>, 225 Kan. 58, 60-61, 587 P.2d 870, 872 (1978) (parties may agree that certain state law governs rights and duties so long as transaction has "reasonable relation" to state); <u>see</u> <u>Concrete Indus., Inc. v. Dobson Bros. Const. Co.</u>, No. 06-1325-WEB, 2007 WL 1455979, at *2 (D. Kan. May 17, 2007). The Court therefore finds that Kansas law controls the contract and warranty claims.

As for plaintiffs' tort claims action, Kansas courts apply the doctrine of lex loci delicti, where the wrong occurred. <u>Hawley v. Beech Aircraft Corp.</u>, 625 F.2d 991, 993 (10th Cir. 1980); <u>see</u> <u>Ling v. Jan's Liquors</u>, 237 Kan. 629, 634, 703 P.2d 731, 735 (1985). The place where the wrong occurred is generally considered to be where the injury was suffered. <u>Ling</u>, 237 Kan. at 634, 703 P.2d at 735. Under this doctrine, Kansas law governs plaintiffs' claims for fraud and negligent misrepresentation. <u>See</u> <u>Ritchie Enters. v. Honeywell Bull, Inc.</u>, 730 F. Supp. 1041, 1046 (D. Kan. 1990). Although Kansas courts have not specifically addressed whether a contract forum provision applies to related tort claims, in this case Kansas law applies under either the contract forum provision or the doctrine of lex loci. <u>See</u> <u>Cobank, ACB v. Reorganized Farmers Co-op Ass'n</u>, 170 F. App'x 559, 567 (10th Cir. 2006).

## II.      Breach of Contract (Count I)

The pretrial order sets forth plaintiffs' claim that Bally breached its contract "by failing to deliver the Software in good working order and by failing to use reasonable efforts to repair errors and defects to restore the Software to good working order," and by representations or warranties that were "incorrect in one or more material respects," and that Bally knew of such error when making

the representation or warranties. <u>Pretrial Order</u> (Doc. #92) at 12. Defendant argues that it is entitled to summary judgment because this claim mirrors plaintiffs' breach of warranty claims and is therefore redundant, citing <u>Lohmann & Rauscher, Inc., v. YKK (U.S.A.), Inc.</u>, 477 F. Supp. 2d 1147, 1153 (D. Kan. 2007). In <u>Lohmann</u>, the court granted summary judgment on plaintiff's breach of contract claim because it was not factually different from the breach of warranty claim. <u>Id.</u> at 1153; <u>see also</u> <u>Robison Farms, Inc. v. ADM Alliance Nutrition, Inc.</u>, No. 05-4089-KGS, 2007 WL 2875132, at *17 (D. Kan. Sept. 29, 2007) (breach of contract claim actually claim for breach of express warranty).

Here, plaintiffs' warranty claims (Counts IV and V) assert that the software was not merchantable and that it did not conform to an express warranty.[17] Portions of plaintiffs' contract claim – that defendant failed to deliver software in good working order contrary to representations or warranties by Bally – appear to mirror the warranty claims in Counts IV and V. <u>See</u> <u>Lohmann</u>, 477 F. Supp. 2d at 1152-53; <u>E. River S.S. Corp. v. Transamerica Delaval, Inc.</u>, 476 U.S. 858, 872 (1986) (essence of warranty action is product's failure to function properly, which allows party to recoup benefit of bargain). Plaintiffs correctly point out, however, that their contract claim alleges that defendant failed to use reasonable efforts to restore the software to good working order as promised in the Agreement. Thus, they argue that their breach of contract claim is not a generic allegation that the software failed to function correctly; rather, it asserts that Bally breached a specific contract term. The Court agrees. Plaintiffs have set out a contract claim which is factually

---

[17]     Plaintiffs' breach of express warranty claim (Count IV) asserts that "Bally breached its express warranties to Plaintiffs that the Systems Software contained certain functions." <u>See</u> <u>Pretrial Order</u> (Doc. #92) at 12-13. Count V (breach of implied warranty) alleges that "the Software failed to comply with minimum standards of merchantability." <u>See</u> <u>id.</u> at 13.

distinct from plaintiffs' warranty claims.  See Agreement at ¶ 4 ("In the event of any error or defect with the Software, Bally will use reasonable efforts to repair such error or defect to restore the Software to good working order").  The Court therefore overrules defendant's motion for summary judgment on Count I.

## III.    Negligent Misrepresentation (Count II)

Defendant asserts that it is entitled to summary judgment on plaintiffs' negligent misrepresentation claim because plaintiffs cannot recover for economic losses in tort without property damage or personal injury.  The Kansas Supreme Court has adopted the tort of negligent misrepresentation as described in the Restatement (Second) of Torts § 552 (1976).  Mahler v. Keenan Real Estate, Inc., 255 Kan. 593, 604, 876 P.2d 609 (1994).[18]  Under Kansas law, the elements of negligent misrepresentation claim are that (1) the person supplying the false information failed to exercise reasonable care or competence in obtaining or communicating it; (2) the party

_____

[18]    The Restatement describes the tort of negligent misrepresentation as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552 (1976).

receiving the false information reasonably relied on it; (3) the person relying on the false information was a person for whose benefit and guidance the information was supplied; and (4) the party receiving the information suffered damages. PIK Civ. 4th 127.43.

Courts generally disallow negligent misrepresentation claims where a plaintiff seeks to recover purely economic losses. See Graphic Tech., Inc., v. Pitney Bowes Inc., 968 F. Supp. 602, 608 (D. Kan. 1997). When liability and damages are dictated by contract principles, the unavailability of a tort claim is logical. Ritchie Enterprises v. Honeywell Bull, Inc, 730 F. Supp. 1041, 1052 (D. Kan. 1990) (citations omitted); see Graphic Tech., 968 F. Supp. at 608 (citing Daitom, Inc. v. Pennwalt Corp., 741 F.2d 1569, 1582 (10th Cir. 1984) (if product not unreasonably dangerous, no need to impose non-contractual duty because buyer has protection through warranty); see also Isler v. Texas Oil & Gas Corp., 749 F.2d 22, 24 (10th Cir. 1984) (concomitant tort and contract claims based on same facts not allowed).

Kansas courts have applied the economic loss doctrine to a wide variety of cases to "prevent a party from asserting a tort remedy in circumstances governed by the law of contracts." K.R. Smith Trucking, LLC v. Paccar, Inc., No. 08-1351-WEB, 2009 WL 3488064, at *7 (D. Kan. Oct. 23, 2009). Plaintiffs argue that the economic loss doctrine does not preclude their negligent misrepresentation claim, citing David v. Hett, 293 Kan. 679, 270 P.3d 1102 (Kan. 2011), and Rinehart v. Morton Bldgs., Inc., 297 Kan. 926, 305 P.3d 622 (Kan. 2013). David held that the doctrine did not bar a homeowner's claims to recover economic damages caused by negligently performed residential construction services. David observed the trend in other jurisdictions to limit application of the economic loss doctrine to situations where the injury complained of cannot be traced back to a tort duty arising *independent* of contract. David, 293 Kan. at 684-693, 270 P.3d at

-15-

1105-11.[19] <u>David</u> noted that applying the doctrine in the residential construction context would not further the policy rationale, in part because such contracts do not involve sophisticated parties with equal bargaining power and in part because service contracts lack warranty protections afforded goods under the UCC.

In <u>Rinehart</u>, Kenneth and Beverly Rinehart contracted with Morton Buildings for a pre-engineered building for their home and company, Midwest Slitting LLC. As a corporate entity, Midwest Slitting was not a party to the contract. During construction disputes arose over the structure's quality and the Rineharts refused payment. In the ensuing lawsuit, the trial court awarded Midwest Slitting damages for negligent misrepresentation. <u>Rinehart</u>, 297 Kan. 926, 305 P.3d at 625 (Midwest Slitting alleged Morton misrepresented that building would be completed in timely fashion and would accommodate Midwest's business needs). Morton appealed, and the Kansas Court of Appeals upheld the misrepresentation award, finding that the economic loss doctrine did not bar Midwest's claims because it had no contract with Morton. Morton appealed to the Kansas Supreme Court, arguing that it should not be liable for negligent misrepresentation because Midwest suffered only economic loss and because it had no contract with Morton. The Kansas Supreme Court ruled as follows:

> We hold negligent misrepresentation claims are not subject to the economic loss doctrine because the duty at issue arises by operation of law and the doctrine's purposes are not furthered by its application under these circumstances. We leave for another day whether the doctrine should extend elsewhere.

---

[19]     For example, the Colorado Supreme Court has held that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." <u>Id.</u> at 1108 (quoting <u>Town of Alma v. AZCO Constr., Inc.</u>, 10 P.3d 1256, 1264 (Colo. 2000)). It further noted that this type of "independent duty analysis" has long been used by Kansas courts to distinguish tort claims from those arising under contract. <u>Id.</u> at 1109.

Rinehart, 305 P.3d at 632-33.  The Kansas Supreme Court rejected a bright-line rule which applies the economic loss doctrine to bar all negligent misrepresentation claims where the parties had contractual privity, noting that the Uniform Commercial Code does not displace fraud and misrepresentation claims.  Rinehart, 305 P.3d at 632; K.S.A. § 84-1-103(b)); see Level 3 Commc'ns, L.L.C. v. Liebert Corp., 535 F.3d 1146, 1162-63 (10th Cir. 2008) (under Colorado law tort of negligent misrepresentation based not on contract but on principles of duty and reasonable conduct). Rinehart further stated that "[i]mportantly, it can be seen that we do not require privity of contract as an element for this cause of action, nor have we said the existence of contractual privity bars the tort."  305 P.3d at 630.

The holdings in David and Reinhart are narrow, and the Court is not entirely convinced that plaintiffs' claim for negligent misrepresentation is viable.  Giving plaintiffs the benefit of the doubt, however, the Court finds that the economic loss doctrine does not bar the negligent misrepresentation claim.  The contract claim arises from defendant's alleged failure to provide software and to restore the software to good working order, as promised in the Agreement.  In contrast, the misrepresentation claim stems from defendant's alleged negligence in conveying inaccurate information before plaintiffs entered the Agreement.

Defendant also argues that the integration clause in paragraph 43 of the Agreement bars plaintiffs from introducing evidence of negligent misrepresentations.  The integration clause, however, does not preclude plaintiffs from offering evidence that defendant's negligent representations induced their consent to contract.  Stechschulte v. Jennings, 298 P.3d 1083, 1097-98 (Kan. 2013) (plaintiff could pursue negligent misrepresentation claim despite contract clause that waived right to rely on representations not set forth in agreement); see Mem'l Hosp. of Laramie

Cnty. v. Healthcare Realty Trust Inc., 509 F.3d 1225, 1235 (10th Cir. 2007) (negligent misrepresentation claim not barred by general integration clause or parol evidence rule); cf. Ritchie Enters. v. Honeywell Bull, Inc., 730 F. Supp. 1041, 1050-52 (D. Kan. 1990) (contract disclaiming prior representations barred negligent misrepresentation claim). The Court finds that defendant is not entitled to summary judgment on plaintiffs' negligent misrepresentation claims.

## IV.     Fraudulent Inducement (Count III)

Defendant asserts that it is entitled to summary judgment on plaintiffs' fraudulent inducement claim (Count III), because the record contains no evidence that defendant made an untrue representation of a material fact.[20]  To prevail on their claim of fraudulent inducement, plaintiffs must prove by clear and convincing evidence that (1) defendant made an untrue statement of existing material fact, (2) defendant knew that the statement was untrue or recklessly made it with disregard for the truth, (3) defendant made the statement with the intent to induce plaintiffs to act on the statement, (4) plaintiffs justifiably relied on the statement to their detriment and (5) plaintiffs sustained injury as a result of their reliance.  Stechschulte v. Jennings, 298 P.3d 1083, 1096 (Kan. 2013); PIK Civ. 4th 127.40.  A representation is material when it relates to some matter that is so substantial as to influence the party to whom it is made.  Kelly v. VinZant, 287 Kan. 509, 515, 197 P.3d 803, 808 (Kan. 2008); PIK Civ. 4th 127.40.

Defendant argues that the record contains no evidence that its representations were untrue, or that plaintiffs relied on them.  Plaintiffs' expert testified that he has no evidence that defendant made any misrepresentations.  Plaintiffs respond that the record contains substantial evidence that

---

[20]     The pretrial order identifies plaintiffs' third theory of recovery as "fraud," but plaintiffs then list as essential elements the five elements of fraudulent inducement.  See Pretrial Order (Doc. #92) at 14-15.

defendant's response to the spreadsheet was materially incorrect and that defendant knew that its statements were incorrect or made them recklessly without knowledge concerning them. In particular, plaintiffs note defendant's admission that it cannot identify the sources of its responses to the Functionality Spreadsheet or what steps those sources took to ensure that the information was accurate. This evidence, however, does not support a finding that defendant knew its statements were untrue or even that it made them recklessly. The Court therefore finds that defendant is entitled to summary judgment on plaintiffs' fraudulent inducement claim.

## V.      Breach of Express Warranty (Count IV)

Defendant next asserts that it is entitled to summary judgment on Count IV (breach of express warranty), because the Agreement contained an express warranty only as to hardware and disclaimed all other express warranties. Plaintiffs assert that defendant made an express warranty when it represented that its software could perform the functions set out on the spreadsheet. See Ex. 12, Doc. #104 (Bally software could execute hundreds of required functions by "a few keystrokes" without special configuration or programming).

The Uniform Commercial Code ("UCC") applies to transactions involving goods, including computer software. Wachter Mgmt. Co. v. Dexter & Chaney, Inc., 282 Kan. 365, 368-69, 144 P.3d 747, 750 (2006) (citing K.S.A. §§ 84-2-102,-105) (computer software goods subject to UCC even when incidental services provided with software) (citing Sys. Design v. Kan. City P.O. Emps. Credit Union, 14 Kan. App. 2d 266, 272, 788 P.2d 878, 882 (1990)). Under the Kansas version of the UCC, the seller creates an express warranty in the following circumstances:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b) Any description of the goods which is made part of the basis of the bargain

creates an express warranty that the goods shall conform to the description.

K.S.A. § 84-2-313(1)(a),(b). The creation of an express warranty does not require that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty. K.S.A. § 84-2-313(2). Nor does it matter "[t]he precise time when words of description or affirmation are made." K.S.A. § 84-2-313 cmt. 7.

Defendant correctly notes that the Agreement includes an express limited warranty on the hardware, but no warranty as to the software.[21] See Agreement at ¶ 18. Further, paragraph 19 of the Agreement includes a "**WARRANTY DISCLAIMER AND LIMITATION OF LIABILITY**" which provides that "[e]xcept as otherwise expressly stated herein, Bally disclaims any and all express or implied warranty, condition, or guaranty, including any implied warranty of merchantability or fitness for a particular purpose." See id. at ¶ 19. Plaintiffs argue that paragraph 19 is ineffective to disclaim express warranties because it is patently inconsistent with paragraph 15(c), which states that Bally is in default if "[a]ny representation or warranty made by Bally . . . in any other document or certificate furnished by Bally to USER is incorrect in any material respect and Bally knew of such error when made." Plaintiffs argue that paragraph 15(c) demonstrates that

---

[21]     Paragraph 18 of the Agreement included the following express limited warranty:

For a period of ninety (90) days after the date of installation, which date of installation, shall be no more than sixty (60) days after USER's receipt of Bally Hardware, Bally warrants to USER that the Bally Hardware, if properly installed by USER, pursuant to Bally's specifications, will be free from defects in workmanship under normal use and service. The 90-day warranty period shall not be extended by the time of repair or for any other reason. Bally's obligations under this limited warranty for Bally Hardware shall be limited to the repair or replacement, in Bally's sole discretion of the defective Bally Hardware.

Agreement at ¶ 18.

the parties contemplated that representations outside the four corners of the Agreement were "part of the basis of the bargain," and were therefore express warranties under K.S.A. § 84-2-313. They argue that paragraph 15(c) incorporates "other document[s] or certificate[s]" and thus takes precedence over paragraph 19's purported disclaimers. Paragraph 15 states that a default regarding representations and warranties occurs *"only if such a representation or warranty was incorrect when made and Bally knew of the error when made."* Agreement at ¶ 15 (emphasis added). As noted in the Court's analysis of the fraud claim, viewed in a light most favorable to plaintiffs, the record contains no evidence that defendant knew of the alleged errors when it made the representation regarding the spreadsheet.

Paragraph 43 of the Agreement states that the Agreement "constitute[s] the entire understanding and contract between the parties." Agreement at ¶ 43. K.S.A. § 84-2-202 provides that a final written agreement may be explained or supplemented "by evidence of consistent additional terms *unless* the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." K.S.A. § 84-2-202 (final written agreement may not be contradicted by extrinsic evidence). Merger clauses such as Paragraph 43 prevent parties from introducing parol evidence of additional agreements. Thus, the representations regarding the spreadsheet are not incorporated into the Agreement as an express warranty.[22] The Court therefore finds that Bally is entitled to summary judgment on plaintiffs' claim that it breached an express

---

[22]     An express warranty may be excluded or modified, with the limitation that "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed whenever reasonable as consistent with each other." K.S.A. § 84-2-316(1). "This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude 'all warranties, express or implied.' It seeks to protect a buyer from unexpected and unbargained language when inconsistent with language of express warranty. . . ." Id., cmt. 1.

warranty.

## VI.    Breach of Implied Warranty of Merchantability (Count V)

Defendant asserts that it is entitled to summary judgment on plaintiffs' breach of implied

warranty of merchantability because the Agreement expressly disclaims such warranties.  Under

K.S.A. § 84-2-314(1), a warranty that goods shall be merchantable "is implied in a contract for their

sale if the seller is a merchant with respect to goods of that kind."[23]  To exclude or modify an

implied warranty of merchantability in a written agreement, the language must mention the word

"merchantability" and the disclaimer must be conspicuous.  See K.S.A. § 84-2-316.  To be

"conspicuous," a term or clause must be written so that "a reasonable person against whom it is to

operate ought to have noticed it."  K.S.A. § 84-1-201(b)(10).  Conspicuous terms include the

following:

> (A) A heading in capitals equal to or greater in size than the surrounding text, or in
> contrasting type, font, or color to the surrounding text of the same or lesser size; and
> (B) language in the body of a record or display in larger type than the surrounding
> text, or in contrasting type, font, or color to the surrounding text of the same size, or
> set off from surrounding text of the same size by symbols or other marks that call
> attention to the language.

K.S.A. § 84-1-201(b)(10)(A), (B).

The sufficiency of an implied warranty disclaimer is a question of law for the Court.  See

Orica NZ Ltd. v. Searles Valley Minerals, No. 04-2310-KHV, 2005 WL 387659, at *2 (D. Kan. Feb.

17, 2005) (citing J & W Equip., Inc. v. Weingartner, 5 Kan. App. 2d 466, 467-68, 618 P.2d 862, 864

(1980)).  In deciding whether a disclaimer is conspicuous, the Court considers the entire document.

---

[23]    A merchant is one "who deals in goods of the kind or . . . holds oneself out as having
knowledge or skill peculiar to the practices or goods involved in the transaction."  K.S.A. §
84-2-104(1).  Defendant does not dispute that it is a merchant under K.S.A. § 84-2-104(1).

See Weingartner, 5 Kan. App. 2d at 470, 618 P.2d at 866. Non-exclusive factors include contrasting type, ink color and type size. Kelley Metal Trading Co. v. Al-Jon/United, Inc., 812 F. Supp. 185, 189 (D. Kan. 1993). The ultimate question is whether the disclaimer is written in a manner which draws the reader's attention to it. Weingartner, 5 Kan. App. 2d at 470, 618 P.2d at 866.

In this case, the 25-page Agreement contains 43 numbered paragraphs. Each paragraph is set apart by extra spacing and labeled with a capitalized bold heading. The bulk of the document is in lower case type. Paragraph 19 is titled **"WARRANTY DISCLAIMER AND LIMITATION OF LIABILITY"** and includes three subparagraphs. The second subparagraph contains a limitation of liability clause and is in upper case type. The subparagraph regarding the warranty disclaimer is in lower case type, however, and states as follows:

> Except as otherwise expressly stated herein, Bally disclaims any and all express or implied warranty, condition, or guaranty, including any implied warranty of merchantability or fitness for a particular purpose and other obligations on the part of Bally for or with respect to the Software, Bally Hardware and Computer Room Equipment or any Professional Services provided by Bally associated with this Agreement. Further, Bally shall have no liability for any errors, defects or other problems caused in use of the Software, Bally Hardware and Computer Room Equipment resulting directly or indirectly from any modifications, alterations, additions or other changes made by USER to the Software, Bally Hardware and Computer Room Equipment without prior authorization from Bally.

See Agreement at ¶ 19. Defendant asserts that plaintiffs knowingly and willingly accepted disclaimers of express and implied warranties other than the limited 90-day warranty for hardware in paragraph 18.

As noted, under Kansas law the implied warranty of merchantability may be disclaimed by contract only if the language specifically mentions merchantability and is "conspicuous." K.S.A. § 84-2-316(2). Here, the language specifically mentions merchantability. Plaintiffs assert that the

disclaimer is ineffective, however, because it is not conspicuous. The Court agrees. Viewing the document as a whole, the disclaimer of warranty is not written in such a manner that "a reasonable person against whom it is to operate ought to have noticed it." K.S.A. § 84-1-201(b)(10). Although two other paragraphs in the document contain sentences which are in capital letters, the subparagraph which purports to disclaim the warranty of merchantability does not contain any capital letters and does not stand out from the rest of the text in the 25 page document. See Kelley Metal, 812 F. Supp. at 189 (disclaimer in lower case letters, same size and same ink color as other provisions not conspicuous); Goodrich Corp. v. BaySys Techs., L.L.C., 873 F. Supp. 2d 736, 745 (E.D. Va. 2012) (disclaimer of implied warranty of merchantability in sixth of seven paragraphs on warranties and in same size, color, and style as other contract provisions not conspicuous); Ricwil, Inc. v. S.L. Pappas & Co., 599 So. 2d 1126, 1130 (Ala. 1992) (disclaimer of implied warranty of fitness under heading "Warranty," but not in larger or contrasting type not conspicuous); cf. CAT Aircraft Leasing, Inc. v. Cessna Aircraft Co., No. 87-1022-C, 1990 WL 171010, at *6 (D. Kan. Oct. 3, 1990) (disclaimer in capital, underlined text conspicuous).

Defendant argues that three other considerations demonstrate that the warranty disclaimer was effective. First, it points out that the parties are sophisticated business entities and argues that they are free to arrange their own contracts "where no fraud or overreaching is practiced." CAT, 1990 WL 171010, at *6. Plaintiffs point to evidence that defendant negligently misrepresented the software capabilities, however, and such evidence suggests overreaching. Second, defendant asserts that the cost of the software compels the conclusion that plaintiffs scrutinized the contract. See id. ($3,000,000 price tag "simply compelled close scrutiny" of transaction by purchaser). The high cost of the software, however, just as strongly suggests that plaintiffs did not knowingly waive the

implied warranty of merchantability. Third, defendant notes that the purchase was the product of several meetings and exchanges between two business entities dealing at arms' length with the benefit of counsel. Id.; see Nester Commercial Roofing, Inc. v. Am'n Builders & Contractors Supply Co., Inc., 250 Fed.Appx. 852, 854 (10th Cir. 2007) (applying Oklahoma law, holding that many factors, including sophistication of buyer, are relevant to conspicuousness). Defendant argues that even if the term "implied warranty of merchantability" was not in capital letters or boldface type, the sophisticated plaintiffs should have noticed the heading for a warranty disclaimer and could be expected to read and understand it. The Court disagrees. Kansas law clearly requires that a disclaimer of the implied warranty of merchantability be conspicuous. Viewing the document as a whole, the disclaimer is not conspicuous. For this reason, the Court finds that defendant is not entitled to summary judgment on plaintiffs' claim for breach of implied warranty of merchantability.

## VII. BHCMC Claims

Defendant asserts that it is entitled to summary judgment in its favor on BHCMC's claims against it because BHCMC was a party to the Agreement only as a guarantor of BHC's payment obligations under the Agreement, citing Bevill Co., Inc. v. Sprint/United Mgmt. Co., 77 F. App'x. 461, 462-63 (10th Cir. 2003) (Kansas follows general rule that absent special status as third-party beneficiary, corporate successor, or assignee, one not party to contract lacks standing to sue for breach). Defendant argues that BHCMC therefore has no standing to assert contract claims against it. BHCMC is a party to the Agreement, however, even though its contractual duties are limited in scope. Defendant does not further address its obligations to BHCMC, and the Court finds that BHCMC's status does not provide a basis to grant defendant's motion for summary judgment as to BHCMC claims.

**VIII.   Limitation of Liability Clause**.

In the alternative, defendant asserts that the limitation of liability provisions in the Agreement limit its liability to the amounts which plaintiffs agreed to pay under the Agreement.  The limitations clause provides in part that "Bally's cumulative liability to USER for all claims arising out of or relating to this Agreement, including Bally's indemnification obligations . . . shall be limited to the total sum of the amounts actually paid by USER for any particular Bally Hardware or Software products pursuant to this Agreement from which such claim(s) may arise, excluding ongoing maintenance payments."  See Agreement, ¶ 19.  Limitations on liability and remedies are enforceable under Kansas law.  K.S.A. § 84-2-719 specifically provides for contractual modification or limitation of remedies:

> (1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,
>
>> (a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and
>>
>> (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
>
> (2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act.
>
> (3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable.  Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

K.S.A. § 84-2-719; see Evolution, Inc., v. SunTrust Bank, 342 F. Supp. 2d 964, 969-70 (D. Kan. 2004) (software purchaser limited to damages as provided in agreement).  Plaintiffs agreed to pay

defendant $281,135.00 for the software. Bally asserts that plaintiffs are therefore limited to seeking damages in that amount.

Plaintiffs assert that the limitation of liability provisions are ineffective because Bally induced the Agreement by fraud. See Audiotext Commc'ns Network, Inc. v. US Telecom, Inc., 912 F. Supp. 469, 475-76 (D. Kan. 1995) (if plaintiffs prove fraud in inducement, recovery not limited to contract amount). The Court, however, has sustained defendant's motion for summary judgment on plaintiffs' fraud claim and this argument therefore is moot. The Court finds that plaintiffs' damages on their contract claim are limited to the $281,135.00 which plaintiffs agreed to pay for the software.

## IX.     Bally's Counterclaim for Breach of Contract

Bally asserts that it is entitled to summary judgment on its counterclaim for $441,560.90 because the record reveals no genuine issue of material fact whether BHC and BHCMC failed to make payments due under the Agreement. Under Kansas law, to establish its breach of contract claim, Bally must show (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) Bally's performance or willingness to perform in compliance with the contract; (4) BHC and BHCMC's breach of the contract; and (5) damages to Bally caused by the breach. Navair, Inc. v. IFR Am., Inc., 519 F.3d 1131, 1137 (10th Cir. 2008) (citing JP Morgan Trust Co. v. Mid-Am. Pipeline Co., 413 F. Supp. 2d 1244, 1272 (D. Kan. 2006)). Non-payment under contract may amount to breach. See Atari, Inc. v. Games, Inc., 164 F. App'x. 183, 184 (2d Cir. 2006) (nonpayment under agreement constituted breach; seller entitled to terminate agreement and full contract damages).

BHC and BHCMC admit the existence of the Agreement, which was accompanied by

consideration. Bally asserts that it did not breach any provision of the Agreement, but that in contravention of the Agreement, BHC and BHCMC stopped making payments. Thus, Bally asserts that BHC and BHCMC are in breach and owe Bally $441,560.90 in damages as set out in Exhibit C.[24]

BHC and BHCMC counter that to prove a claim for breach of contract, Bally must prove that it performed or was willing to perform in compliance with the contract. Britvic Soft Drinks Ltd. v. ACSIS Techs., Inc., 265 F. Supp. 2d 1179, 1187 (D. Kan. 2003). BHC and BHCMC have produced evidence that Bally did not comply with the contract because it did not use reasonable efforts to repair errors and defects in the software. The Court therefore finds that Bally is not entitled to summary judgment on its counterclaim.[25]

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #83) filed July 15, 2013, be and hereby is **SUSTAINED** as to plaintiffs' fraudulent inducement claim (Count III) and breach of express warranty claim (Count IV). The Court further finds that plaintiffs' damages on their contract claim are limited to $281,135.00.

**IT IS FURTHER ORDERED** that Defendant's Motion For Summary Judgment (Doc. #83) filed July 15, 2013, be and hereby is **OVERRULED** as to plaintiffs' breach of contract claim (Count I), negligent misrepresentation claim (Count II) and breach of implied warranty claim

---

[24]    Defendant claims that plaintiffs owe $441,560.90 in professional service fees and billable expenses pursuant to the Agreement. Sharon Stroburg, the casino General Manager, testified, however, that the Bally figure does not account for all payments that plaintiffs made to Bally. Based on the record the amount due is contested.

[25]    Plaintiffs also argue that because Srinivasan told them that they did not need to pay until they were satisfied, defendant waived its right to payments under the Agreement. Rights under a contract may be waived even in the absence of a signed agreement, and compliance with the statute of frauds is not required. See K.S.A. § 84-2-209. This issue remains for trial.

(Count V).

**IT IS FURTHER ORDERED** that Defendant's Motion For Summary Judgment (Doc. #83)

filed July 15, 2013, be and hereby is **OVERRULED** as to its counterclaim for breach of contract.

Dated this 4th day of December, 2013, at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge